IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:24-cv-307-MR-WCM

| | |
|---|---|
| ASHEVILLE BLADE, LLC,<br>MATILDA BLISS, and<br>MELISSA COIT,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ASHEVILLE;<br>MICHAEL YELTON;<br>MICHAEL MCCLANAHAN;<br>MELISSA LACKEY;<br>JOHNATHAN MCCAIN;<br>AMY STAPANOWICH;<br>MATT STAPANOWICH;<br>IAN COOPER;<br>JOHN ZIEGLER; and<br>SAMUEL DEGRAVE,<br>*in their individual capacities*,<br><br>Defendants. | **MEMORANDUM AND RECOMMENDATION** |

This matter is before the Court on Defendants' Motion to Dismiss the Amended Complaint (the "Motion to Dismiss," Doc. 15), which has been referred to the undersigned for the entry of a recommendation pursuant to 28 U.S.C. § 636.

## I. Relevant Procedural Background

On December 23, 2024, Asheville Blade, LLC ("Blade"), Matilda Bliss ("Bliss"), and Melissa Coit ("Coit") (collectively, "Plaintiffs") filed their Complaint in this Court. Doc. 1.

On March 18, 2025, the parties filed a joint motion requesting that the case be stayed pending resolution of a related state court criminal appeal by Bliss and Coit. Doc. 5. The Court granted that motion, and the case was stayed until September 17, 2025. Docs. 8, 11.

On September 30, 2025, Plaintiffs filed an Amended Complaint against the City of Asheville (the "City") and Asheville Police Department ("APD") Deputy Chief of Operations Michael Yelton, Lieutenant Michael McClanahan, Sergeant Melissa Lackey, Officer Johnathan McCain, Officer Amy Stapanowich, Officer Matt Stapanowich, Detective Ian Cooper, Detective John Ziegler, and Detective Samuel DeGrave, in their individual capacities (the "Individual Defendants"). Doc. 14.

On October 17, 2025, the City and the Individual Defendants (collectively "Defendants") filed the Motion to Dismiss. Docs. 15, 15-1. Plaintiffs responded and Defendants replied. Docs. 17, 18.

On May 13, 2026, the undersigned held a hearing on the Motion to Dismiss.

## II. Plaintiffs' Allegations and Claims

### A. The Arrests of Bliss and Coit and the Seizure of Bliss's Phone

At the time of the events described in the Amended Complaint, Blade was a local news publication that regularly published articles criticizing the APD, including the APD's treatment of homeless people. Doc. 14 at ¶ 1; see also ¶¶ 28-31. Bliss and Coit were journalists for Blade and reported on news related to the APD. Id. Defendants were aware of Plaintiffs' critical reporting. See id. at ¶¶ 43-47.

On December 19, 2021, community supporters of Asheville's homeless population began a multi-day protest in Aston Park (the "Park"), a public park that is owned and operated by the City. Id. at ¶ 49. Bliss and Coit were present in the Park at different times during the day to cover the protest for Blade. Id. at ¶¶ 50-52. APD officers announced that a City ordinance established a 10:00pm curfew for the Park and that anyone who remained in the Park past that time would be arrested for trespassing. Officers, however, did not make any arrests that night. Id. at ¶¶ 53-54.

On December 25, 2021, Bliss and Coit were again present in the Park; they identified themselves to APD officers as members of the press and Bliss wore her official press credentials. Id. at ¶¶ 55, 58-59. After 10:00pm, Lieutenant McClanahan instructed Bliss and Coit to leave the Park. Id. at ¶ 62. Bliss and Coit responded that they were members of the press and

Lieutenant McClanahan said they could observe and report from a location about 150 feet away and down a hill, though Bliss and Coit could not see the Park from that location. Id. at ¶¶ 62-64. Shortly thereafter, Officer Amy Stapanowich and Sergeant Melissa Lackey demanded that Bliss and Coit leave the Park. Bliss and Coit again responded that they were members of the press. Id. at ¶¶ 70-72.

Lieutenant McClanahan then instructed other APD officers to arrest Bliss and Coit. Id. at ¶ 76. The Amended Complaint asserts that Bliss and Coit were arrested "because they were journalists engaged in scrutinizing APD's controversial activities on the night of December 25, 2021." Id. at ¶ 4. Coit was arrested at 10:29pm and Bliss was arrested at 10:30pm; both were charged with second-degree trespass. Id. at ¶¶ 76, 85. Four other individuals were also arrested. Id. at ¶ 109.

While Bliss was being arrested, Officer Matt Stapanowich "collected" Bliss's phone without Bliss's consent and logged it into the APD's evidence system. Id. at ¶ 84. Despite several requests from Bliss and her attorney, Officer Matt Stapanowich, Detective Cooper, Detective Ziegler, and Detective DeGrave (the "Phone Defendants") held Bliss's phone without explanation

other than to say that the phone needed to be held until the holidays passed. Id. at ¶¶ 88-90.[1]

On January 19, 2022, Detective Cooper applied for and received a warrant that authorized a search of Bliss's phone. Id. at ¶ 93. Detective Cooper's affidavit in support of that warrant application stated that a "conspiracy was uncovered involving at least 19 suspects" and that "these suspects had communicated extensively about the protest on 12/21/21" and had planned, among other things, "how they would deter police from arresting them." Id. at ¶ 93. The affidavit additionally stated that Bliss referenced a "community art build" on a social media page, that "[t]his community art build was identified as the protest where nearly 2000 lbs of litter were left," and that "Bliss had prior knowledge of that protest." Id. at ¶ 94.

At some point following the Christmas Day arrests, then-chief of police David Zack stated: "I've dealt with hundreds of journalists and never had to arrest one. So, something is different in this situation which is obvious....[M]aybe, it was the journalists who were the problem." Id at ¶ 105. Additionally, on January 25, 2022, the City Manager "spoke in support of Bliss and Coit's arrests and claimed that police have discretion to decide who is a journalist and who is not." Id. at ¶ 106.

---

[1] Officers also seized a phone from Coit on December 25, 2021 but returned that phone the following morning. Id. at ¶¶ 84, 86.

On March 8, 2022, Bliss received her phone back from the APD. Id. at ¶ 101.

Because of their trespassing charges, Bliss and Coit were banned from all City parks from December 25, 2021 to December 25, 2022. Id. at ¶ 107.

Additionally, Blade was unable to cover the APD's activities related to the ejection and/or arrest of protestors and homeless people fully because Bliss and Coit were dealing with legal proceedings and were banned from City parks. Id. at ¶¶ 124-26. As a result, Blade's donations and subscriptions decreased and some subscribers canceled their subscriptions. Id. at ¶¶ 129-31.

On April 19, 2023, Bliss and Coit were convicted of second-degree trespassing in the District Court of Buncombe County, North Carolina. They appealed their convictions and, on June 15, 2023, were tried before a jury in the Superior Court of Buncombe County, North Carolina and again convicted of second-degree trespassing. Id. at ¶¶ 115-117.

On June 4, 2025, the North Carolina Court of Appeals affirmed the convictions. State v. Bliss, No. COA24-92, 299 N.C. App. 302, 915 S.E.2d 735 (2025) (the "State Court Decision").

**B. The APD's Enforcement of the Park Curfew**

Plaintiffs allege that the APD has enforced the curfew at the Park inconsistently. Specifically, Plaintiffs contend that publicly available arrest records show that from 2012-2021, thirteen (13) people were charged with

second-degree trespassing within one hour of the Park's curfew; six (6) of those (including Bliss and Coit) were arrested on Christmas Day 2021 as described above. Id. at ¶ 109.

Additionally, Plaintiffs allege that body camera footage from December 25, 2021 "shows a man not involved in the protest walking through the park as officers are arresting protestors and journalists." Id. at ¶ 110. Plaintiffs contend that this man was "on his way to get beer" and was not arrested. Id.

Further, Plaintiffs allege that the APD routinely declines to enforce the curfew against people who are walking or jogging in the Park between 3:30am and 6:00am, which is before the Park is open. Id. at ¶ 111.

Finally, Plaintiffs allege that since 2017, there have only been nine (9) "on-the-job" arrests of journalists in North Carolina, that three (3) of those arrests involved Bliss and Coit[2], and that Bliss and Coit are the only journalists who have been charged with trespassing while reporting. Id. at ¶¶ 113-114.

[2] Coit was also arrested on August 9, 2020 while covering a different protest. Id. at ¶ 34.

### C. Plaintiffs' Claims

The Amended Complaint includes the following claims:

| **Claim:** | | **By:** | **Against:** |
|---|---|---|---|
| 1 | 42 U.S.C. § 1983 (First Amendment Violation of Rights to Speech and Press, Recording, and Newsgathering – Retaliatory and Selective Enforcement) | All Plaintiffs | All Defendants |
| 2 | 42 U.S.C. § 1983 (Fourth Amendment Seizure of Plaintiff Bliss's Phone) | Bliss | Phone Defendants |
| 3 | Article I, Section 14 of the North Carolina Constitution (Retaliation for Speech and Newsgathering) | All Plaintiffs | City |
| 4 | Article I, Section 20 of the North Carolina Constitution (Seizure of Plaintiff Bliss's Phone) | Bliss | City |
| 5 | Privacy Protection Act, 42 U.S.C. § 2000aa, et seq. ("PPA") (Seizure of Plaintiff Bliss's Phone) | Blade and Bliss | City |
| 6 | Failure to Train Leading to Violations of the Privacy Protection Act | Blade and Bliss | City |

## III. Legal Standards

### A. Rule 12(b)(1)

A motion to dismiss made pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure raises the issue of whether the court has subject-matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). "Subject matter jurisdiction is a threshold question that relates to the power of the court to hear a case and

must be resolved before a court addresses the merits of a case." Cap. Associated Indus., Inc. v. Cooper, 129 F. Supp.3d 281, 299 (M.D.N.C. 2015) (citing Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479-80 (4th Cir. 2005)).

Questions regarding a plaintiff's standing to sue may be resolved in the context of a Rule 12(b)(1) motion. See Moss v. Spartanburg Cnty. School Dist. No. 7, 676 F. Supp.2d 452, 456 (D.S.C. 2009) (analyzing the defendant's standing challenge to subject matter jurisdiction, which may include evidence outside of the pleadings without converting the motion to one for summary judgment, under Federal Rule of Civil Procedure 12(b)(1)) (citing White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005)).

**B. Rule 12(b)(6)**

When considering a motion made pursuant to Rule 12(b)(6), the court accepts the allegations in the complaint as true and construes them in the light most favorable to the claimant. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009).

The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192. That is, while "detailed factual allegations" are not required, the

complaint (or counterclaim) must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); see Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility" when the claimant "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a claim from conceivable to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

## IV. Discussion

Based on their briefing and representations during the hearing, the parties agree that Plaintiffs' claims for alleged violations of the North Carolina Constitution (Claims 3 and 4) may be analyzed in the same way as Plaintiffs' claims pursuant to 42 U.S.C. § 1983 for alleged violations of the United States Constitution (Claims 1 and 2). See also Norris v. City of Asheville, 721 F. Supp.3d 404, 418 (W.D.N.C. 2024) ("Given the similarities of the federal and state freedom of speech protections, the Plaintiffs' state law freedom of speech claim will survive the Defendants' Motion to Dismiss for the same reasons as the federal claims."); Munn-Goins v. Bd. of Trs. of Bladen Cmty. Coll., 658 F. Supp.2d 713, 730 (E.DN.C. 2009) ("The standards for free-speech claims under the North Carolina Constitution are substantially identical to those for free-

speech claims under the federal constitution."), aff'd, 393 F. App'x 74 (4th Cir. 2010); State v. Royster, 280 N.C. App. 281, 287 (2021) ("Though the language in the North Carolina Constitution (Article I, Sec. 20), providing in substance that any search or seizure must be 'supported by evidence,' is markedly different from that in the federal constitution, there is no variance between the search and seizure law of North Carolina and the requirements of the Fourth Amendment as interpreted by the Supreme Court of the United States.") (quoting State v. Hendricks, 43 N.C. App. 245, 251-52 (1979), disc. review denied, 299 N.C. 123 (1980)).

### A. Speech-Based Claims

#### 1. Blade's Standing

With regard to an organization, "the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" Students for Fair Admissions, Inc. v. President and Fellows of Harvard College, 600 U.S. 181, 199 (2023) (quoting Warth v. Seldin, 422 U.S. 490, 511 (1975)).

Here, Blade "asserts organizational standing, not third-party standing." Doc. 17 at 13. That is, Blade contends that it may assert claims in its own right based on the arrests of Bliss and Coit.

"In determining whether organizational standing exists, 'a court conducts the same inquiry as in the case of an individual.'" People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc., 843 F. App'x 493, 495 (4th Cir. 2021) (unpubl.) (quoting Md. Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1250 (4th Cir. 1991)).

To establish Article III standing,

> 'a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'
>
> South Carolina v. United States, 912 F.3d 720, 726 (4th Cir. 2019) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)).

Defendants argue that Blade has failed to identify a sufficient "injury in fact."

"With respect to an injury-in-fact…an organization that 'seek[s] to do no more than vindicate [its] own value preferences through the judicial process' cannot establish standing." People for Ethical Treatment of Animals, Inc., 843 F. App'x at 495 (quoting Sierra Club v. Morton, 405 U.S. 727, 740 (1972)). An organization, "however, 'may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission.'" Id. (quoting Lane v. Holder,

703 F.3d 668, 674 (4th Cir. 2012) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).

Here, Blade alleges that, after the arrests of Bliss and Coit, it was unable to cover the APD's activities related to the ejection and/or arrest of protestors and homeless people fully because Bliss and Coit were dealing with legal proceedings and were banned from City parks and that, as a result, Blade suffered a reduced rate of donations and subscriptions and that some subscribers canceled their subscriptions. Doc. 14 at ¶¶ 124-26, 129-31.

At the pleading stage, the undersigned is persuaded that Blade has sufficiently alleged an injury in fact. See People for Ethical Treatment of Animals, Inc., 843 F. App'x at 495-96 (concluding that the plaintiff sufficiently alleged Article III standing where it showed the defendants' "ESA-violative conduct 'perceptibly impaired' PETA's ability to carry out its mission through frustration of that mission and a consequent drain on its resources") (citing Havens Realty Corp., 455 U.S. at 379).

### 2. Claims Against the Individual Defendants

#### a. Sufficiency of the Allegations

The Supreme Court has held that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991).

At the same time, "'the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." Nieves v. Bartlett, 587 U.S. 391, 398 (2019) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." Id. (citations omitted).

To state a First Amendment retaliation claim, a plaintiff "must allege that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005). "Although probable cause should generally defeat a retaliatory arrest claim," the Supreme Court has found that "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Nieves, 587 U.S. at 406. The Court has explained:

> For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First

> Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest. In such a case…probable cause does little to prove or disprove the causal connection between animus and injury, ….
>
> For those reasons, we conclude that the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.
>
> Id. at 407.

A plaintiff does not need to provide virtually identical comparators. See Gonzalez v. Trevino, 602 U.S. 653, 658 (2024) ("Although the Nieves exception is slim, the demand for virtually identical and identifiable comparators goes too far."). But a plaintiff "still must offer evidence that he was treated differently than others who engaged in the same conduct." Stanley v. Bocock, 160 F.4th 573, 578 (4th Cir. 2025) (internal citations omitted).

Here, Plaintiffs do not argue that their arrests were not supported by probable cause. Rather, they argue that their arrests fit within the narrow exception described by Nieves.

Whether Plaintiffs' allegations are sufficient for this purpose presents a close call. On one hand, while the Amended Complaint indicates that Bliss and Coit were arrested on December 25, 2021, it also indicates that four individuals who were not journalists were also arrested at the same time.

On the other hand, Plaintiffs allege that between 2012 and 2021 only seven (7) other individuals (i.e., individuals who were not arrested on December 25, 2021) were charged in Asheville with second-degree trespassing within one hour of the Park's curfew, that the APD routinely declines to enforce the curfew in other settings, and that instances of journalists being arrested in North Carolina since 2017 for any reason have been "exceedingly rare." Id. at ¶¶ 109 – 114.

Viewing Plaintiffs' allegations in the light most favorable to Plaintiffs, the undersigned is persuaded that the Amended Complaint sets forth allegations that are sufficient to allow Plaintiffs to proceed to discovery on their claims for retaliatory arrest. See Gonzalez, 602 U.S. at 658-59 (approving of the plaintiff's ten-year survey evidence as sufficient to meet the Nieves exception); Murphy v. Schmitt, 143 F.4th 914, 918-19 (8th Cir. 2025) (concluding that, similar to the plaintiff in Gonzalez, the plaintiff's allegation that "no one else in recent memory has been detained or arrested by any law enforcement officers in Sunrise Beach or Camden County" for walking on the wrong side of the roadway was sufficient at the pleading stage to bring the plaintiff's case within the Nieves exception); Ortolano v. City of Nashua, 766 F. Supp.3d 328, 333-34 (D.N.H. 2025) (concluding that evidence showing the plaintiff was the only person arrested for trespassing after complying with a

police request to leave the premises satisfied the Gonzalez objective evidence standard for the Nieves exception).

### b. Qualified Immunity[3]

Defendants assert that qualified immunity precludes Plaintiffs' §1983 claim against the Individual Defendants for alleged violations of Plaintiffs' First Amendment rights.

"Qualified immunity 'is an affirmative defense' which 'may be invoked by a government official sued in his personal, or individual, capacity.'" Doe v. Univ. of N.C. System, 133 F.4th 305, 315 (4th Cir. 2025) (quoting Ridpath v. Bd. of Governors of Marshall Univ., 447 F.3d 292, 305-06 (4th Cir. 2006)). "This defense shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983…." Doe, 133 F.4th at 315 (quoting Ridpath, 447 F.3d at 305–06 (citing Wilson v. Layne, 526 U.S. 603, 609 (1999) (internal quotation marks omitted))). "An officer is entitled to qualified immunity unless he (1) 'violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was clearly established at the

---

[3] Since Plaintiffs have not asserted speech-based claims for violations of the North Carolina Constitution against any of the Individual Defendants, it is not necessary to reach the question of whether public official immunity would bar those claims. See Doc. 17 at 11 ("Defendants' arguments about individual public official immunity for state constitutional claims are irrelevant, because Plaintiffs' claims under the North Carolina Constitution are asserted only against the City.").

time.'" Hulbert v. Pope, 70 F.4th 726, 732 (4th Cir. 2023) (quoting District of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018)).

The Fourth Circuit has explained that "[t]he First Amendment guarantees an individual the right to speak freely, including the right to criticize the government and government officials. To protect that right, public officials are prohibited from retaliating against individuals who criticize them." Trulock v. Freeh, 275 F.3d 391, 404 (4th Cir. 2001) (internal citations omitted).

Here, the Amended Complaint alleges that Bliss and Coit were arrested after they identified themselves as journalists and that APD officers made comments suggesting that they (the officers) were inclined to arrest Bliss and Coit because of their journalistic actions criticizing the APD. See Doc. 14 at ¶¶ 4, 58-61, 43, 66-69, 78, 82. As discussed above, a retaliatory arrest claim is generally barred where there is probable cause for the arrest, but Nieves provides a limited exception to that general rule and, on the current record, the undersigned is persuaded that Plaintiffs have sufficiently alleged the applicability of that exception. For the same reasons, the undersigned finds that Plaintiffs have alleged adequately the violation of a constitutional right.

As for the second prong of the qualified immunity analysis, the Fourth Circuit has also explained that "[i]t is well established that a public official may not misuse his power to retaliate against an individual for the exercise of

a valid constitutional right." Trulock, 275 F.3d at 406 ("we hold that it was clearly established at the time of the search that the First Amendment prohibits an officer from retaliating against an individual for speaking critically of the government.").[4]

Consequently, the undersigned will not recommend that Plaintiffs' speech-based claims be dismissed on the basis of qualified immunity at this stage of the case. See Tobey v. Jones, 706 F.3d 379, 389 (4th Cir. 2013) (affirming the denial of qualified immunity at the pleading stage on a First Amendment retaliatory arrest claim where it was "unclear whether [the defendant's] behavior was reasonably motivated by [the plaintiff's] 'disruptive' conduct or unreasonably motivated by his protected protest," and stating that the "question of reasonableness is a fact-intensive inquiry").

[4] Plaintiffs also argue that a bystander had a clearly established right to record police activity. But even assuming that such a right was clearly established in the Fourth Circuit in 2021, Bliss and Coit were not merely observing police activity from a distance, as bystanders. See Doc. 15 at ¶¶ 63, 76; Hulbert v. Pope, 70 F.4th 726, 736 (4th Cir. 2023) (noting that neither "this court, nor the Supreme Court, nor any other circuit has recognized an unlimited First Amendment right to film police free of otherwise reasonable limitations. In fact, the circuits that recognized a right to film explicitly noted that it may be subject to reasonable time, place, and manner restrictions.") (collecting cases) (quotation omitted); Suiter v. Taylor, No. 5:23-cv-00062, 2024 WL 3466186, at *6 (W.D. Va. July 19, 2024) (concluding that the right to film another person's traffic stop from 100 feet away was not clearly established in August 2022).

### 3. Claims Against the City

#### a. Policy or Custom

"Local governing bodies…can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978). Such liability cannot be predicated upon a *respondeat superior* theory. See Burgess v. Goldstein, 997 F.3d 541, 562 (4th Cir. 2021); City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989) (a municipality can be liable under § 1983 only where its policies are the "moving force" behind the constitutional violation) (quoting Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)).

To state a claim for Monell liability, a plaintiff must allege "a constitutional harm that stems from the acts of a municipal employee 'taken in furtherance of some municipal 'policy or custom.''" Thomas v. Elis, No. 1:23-CV-00354-MR, 2024 WL 1161037, at *3 (W.D.N.C. Mar. 18, 2024) (quoting Milligan v. City of Newport News, 743 F.2d 227, 229 (4th Cir. 1984) (quoting Monell, 436 U.S. at 694)). Additionally, a plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality and that there is an affirmative causal link between the policy and the plaintiff's injury. Id. (citing Spell v. McDaniel, 824 F.2d 1380, 1389 (4th Cir. 1987)).

For a policy to be sufficient to support a Monell claim based on an alleged failure to train, the lack of training must reflect "a deliberate or conscious choice." City of Canton, Ohio, 489 U.S. at 389. "[T]raining policy deficiencies for which municipal liability may be imposed include not only express authorizations of specific unconstitutional conduct, but tacit authorizations, and failures adequately to prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty." Spell, 824 F.2d at 1390. "No matter which theory is alleged, the plaintiff must point out 'a specific deficiency' in training, 'rather than general laxness or ineffectiveness in training.'" Thomas v. Elis, 2024 WL 1161037, at *3 (citing Spell, 824 F.2d at 1390). "Deliberate indifference is shown if 'the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights.'" Id. (quoting City of Canton, 489 U.S. at 390).

Here, Plaintiffs allege that the City did not have a policy "that protects the rights of journalists to gather news about police engaged in the performance of their duties" and that the City "failed to train APD officers in the appropriate treatment of journalists engaged in newsgathering" and the "importance of not arresting people and not retaining arrestee property for retaliatory purposes, even where probable cause may exist." Doc. 14 at ¶¶ 162-163.

These allegations, though, are too conclusory to support a failure to train claim under Monell. For example, Plaintiffs do not allege facts to support an inference that there was an obvious need for training with respect to the potential mistreatment of journalists by the APD. Indeed, the Amended Complaint alleges that arrests of journalists are "exceedingly rare." Doc. 14 at ¶ 112.

**b. Ratification**

When a final policymaker "has the authority to review the decision of a subordinate," the policymaker's approval of an allegedly unconstitutional decision "can also give rise to liability under Section 1983." Starbuck v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 534 (4th Cir. 2022) (citing Hall v. Marion Sch. Dist. No. 2, 31 F.3d 183, 196 (4th Cir. 1994)). This "ratification liability" "critically differs from [respondeat superior] liability, ... which is impermissible under Monell ..., [because] ratification liability does not hold a municipality liable for the actions of subordinate officials; rather it holds the municipality liable for its own decision to uphold the actions of subordinates." Id. However, to proceed against a municipality under such a theory, "the final decisionmaker's ratification of a subordinate's decision must still *cause* the alleged constitutional injury." Jackson v. Town of Farmville, No. 3:22-CV-729, 2023 WL 3871697, at *6 (E.D. Va. June 7, 2023) (emphasis in original).

Here, Plaintiffs allege that the chief of police and the City Manager condoned the arrests of Bliss and Coit after those arrests occurred. Id. at ¶¶ 104-106. In that regard, Plaintiffs contend that the chief of police suggested that "maybe, it was the journalists who were the problem" and that the City Manager "spoke in support of Bliss and Coit's arrests…." Id. at ¶¶ 105, 106.

But Plaintiffs have not alleged sufficient plausible facts to support an inference that the statements by the chief or the City Manager caused Plaintiffs' injuries. See Franklin v. City of Charlotte, 64 F.4th 519, 536-537 (4th Cir. 2023) (finding that the plaintiff could not hold the city liable pursuant to a ratification theory where, although it was undisputed that the city manager declared that an officer acted in conformity with the department's use-of-force policy and applicable law in killing decedent, such post-facto approval could not have caused the constitutional violation); Jackson, 2023 WL 3871697, at *7 ("the failure to discipline Officer Coblentz did not cause Jackson's injury and is not a decision that can support a ratification theory for Monell liability."); Brown v. City of Lynchburg, No. 6:23-CV-00054, 2024 WL 2724191, at *9 (W.D. Va. May 28, 2024) (explaining that "[t]he Fourth Circuit distinguished between situations where approval by a policymaker creates a distinct injury—and so creates ratification liability—and those where approval adds nothing to the injuries already suffered" and granting motion to dismiss plaintiffs' ratification claim because "[t]he approval, after the fact, of excessive

force cannot create ratification liability because it is not the source of the injuries”).

#### 4. Collateral Estoppel

The Fourth Circuit has explained that “the doctrines of res judicata and collateral estoppel apply to § 1983 actions, and federal courts must afford preclusive effect to issues which have been decided by state courts when the courts of that state would do so.” Gilliam v. Sealey, 932 F.3d 216, 231 (4th Cir. 2019) (quoting Allen v. McCurry, 449 U.S. 90, 96 (1980) (citing Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 85 (1984) (cleaned up)). Under North Carolina law, a prior judicial decision will preclude the relitigation of an issue in a later action “provided the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding.” Megaro v. McCollum, 66 F.4th 151, 160 (4th Cir. 2023) (citing Whitacre P’ship v. Biosignia, Inc., 358 N.C. 1, 15 (2004)).

North Carolina courts have “upheld collateral estoppel of an issue in a civil suit when that issue was previously established as an element of a criminal conviction.” Burton v. City of Durham, 118 N.C. App. 676, 680, 682 (1995) (citing Hill v. Winn–Dixie Charlotte, Inc., 100 N.C.App. 518, 397 S.E.2d 347, 349 (1990) and explaining that “the jury was required to find probable cause to arrest and that plaintiff was not arrested for ‘merely remonstrating’ with the officer, in order to find that the arrest was lawful. Since, after full

litigation of this issue, the jury necessarily found that plaintiff was not arrested for his verbal protests, plaintiff is precluded from litigating it again here.”).

In the State Court Decision, the North Carolina Court of Appeals explained that the issue before it was whether the trial court erred “by denying [Bliss and Coit’s] as-applied constitutional challenge.” 299 N.C. App. 302, 2025 WL 1576187 at *2. The court addressed Bliss and Coit’s argument that their newsgathering was protected by the First Amendment, and the State’s opposing position that “the First Amendment was not implicated because the Park Curfew regulates conduct, not speech.” Id. The court concluded that the Park curfew regulated “pure conduct” and did “not aim to restrict free expression” such that the curfew did not “place an incidental burden on free speech” and, therefore, Bliss and Coit’s “First Amendment rights were not implicated.” Id. at *4. The court went on to state that “[e]ven assuming [Bliss and Coit’s] speech was protected,” the Park curfew was justified and “was a reasonable time, place, manner restriction under the public forum doctrine.” Id. at *5.

The undersigned reads the State Court Decision as constituting a challenge by Bliss and Coit to their criminal convictions based on their contention that the Park curfew was unconstitutionally applied to them.

In contrast, in this matter, Plaintiffs do not assert that Bliss and Coit's convictions were improper because the curfew itself was invalid (as applied to Bliss and Coit) or that there was no probable cause to support Bliss and Coit's arrests. Rather, Plaintiffs contend that, even though there was probable cause to arrest Bliss and Coit and the curfew was validly applied to them, Bliss and Coit's arrests were nonetheless carried out in such a way that violated their First Amendment rights—namely that the officers arrested them in retaliation for protected First Amendment activity.

Consequently, Plaintiffs' retaliatory arrest claims are not barred by collateral estoppel.

### 5. Heck v. Humphrey

Defendants also contend that the Supreme Court's rule from Heck v. Humphrey, 512 U.S. 477 (1994), precludes Plaintiffs' claims that arise from Bliss and Coit's arrests.

In Heck, the Supreme Court explained that the principle that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement." Heck, 512 U.S. at 486. The Court went on to hold that

> . . . in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness

> would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.
>
> Id. at 486–87 (footnotes omitted) (emphasis in original).

In Covey v. Assessor of Ohio Cnty., 777 F.3d 186 (4th Cir. 2015), the Fourth Circuit appeared to suggest a limit to the application of Heck and explained that where a plaintiff "was unable to pursue habeas relief because of insufficient time or some other barrier, then Heck is wholly inapplicable to [his] § 1983…claims." Id. at 198; see also id. at 197, n.10 (Heck does not apply "to claimants no longer in custody and thus without access to habeas relief, *at least* when the claimant is not responsible for failing to seek or limiting his

own access to habeas relief") (emphasis in Covey); Bairefoot v. City of Beaufort, S.C., 312 F. Supp. 3d 503, 513 (D.S.C. 2018) ("Heck does not bar this case because Plaintiffs have plausibly pleaded that habeas relief was unavailable due to the short periods of imprisonment involved.").

Here, as an initial matter, it is not clear how Heck – which generally prohibits a claimant from seeking to invalidate an underlying criminal conviction in the context of a Section 1983 action – interacts with Nieves – which allows certain claims to proceed even though the claimant's arrest was supported by probable cause.[5]

However, even setting that question aside, and assuming that Heck may apply in circumstances in which a claimant has alleged the Nieves exception adequately, the Amended Complaint, when read in the light most favorable to Plaintiffs, indicates that Bliss and Coit were only briefly in custody. See Doc. 14 at ¶¶ 76, 85, 115-120; State v. Bliss, 299 N.C. App. 302, 915 S.E.2d 735, 2025 WL 1576187, at *2 (2025). Whether they were in custody for a sufficient amount of time such that Heck would bar their claims is a question that can

[5] Defendants characterize Nieves as an exception to Heck. See Doc. 15-1 at 8 ("The allegations of the Amended Complaint disclose that First Amendment retaliatory arrest claims presented in this action do not come close to fitting within the Nieves exception to Heck."). To the extent that characterization is accurate, the undersigned finds, as discussed above, that Plaintiffs have alleged the Nieves exception adequately.

be addressed if necessary at a later stage of the proceeding and following further development of the record.

### B. Seizure-Based Claims

#### 1. Claim Against the Phone Defendants

##### a. Sufficiency of the Allegations

"To determine if an extended seizure violates the Fourth Amendment, we balance the government's interest in the seizure against the individual's possessory interest in the object seized." United States v. Pratt, 915 F.3d 266, 271 (4th Cir. 2019). "[I]f the individual's interest outweighs the government's, an extended seizure may be unreasonable." Id.

In their Amended Complaint, Plaintiffs allege that both Bliss and Coit's phones were collected at the time of their arrests on December 25, 2021, that Coit's phone was returned the following day, and that Bliss's phone was held for 25 days without a warrant despite repeated requests by Bliss and her attorney that her phone be returned. Doc. 14 at ¶¶ 84-86, 88. Plaintiffs further allege that the only proffered reason for the APD's continued possession of Bliss's phone was "that the phone needed to be held until after the holidays passed." Id. at ¶ 90. Additionally, Plaintiffs contend that Bliss's attorney emailed the District Attorney's office on January 14, 2022 requesting that the phone be returned, and that an Assistant District Attorney replied that "she [the Assistant District Attorney] sent an email to an APD officer to verify

whether the property was needed for further investigation…[but] she did not expect that it was needed….” Id. at ¶ 91-92.

Defendants point out that the seizure of Bliss's phone occurred on Christmas Day and assert that the holiday season justified the delay in obtaining a warrant. They recognize that "some factual discovery will typically need to occur before a district court can conduct its reasonableness analysis" but argue that the allegations in the Amended Complaint are of the sort "that have routinely been found to justify a delay in applying for a warrant." Doc. 15-1 at 17.

Whether the holiday season, or other factors, justified the 25-day delay between the seizure of Bliss's phone and the warrant application, however, is a question more appropriately considered following further development of the record. Compare Pratt, 915 F.3d at 272-73 (concluding that a month-long delay in seeking a search warrant was unjustified where the Government's only explanation for the delay was that it was determining the proper jurisdiction to seek the warrant) and United States v. Mitchell, 565 F.3d 1347, 1351 (11th Cir. 2009) (concluding that a 21-day delay in seeking a search warrant was unjustified where the Government's only explanation for the delay was that the investigating agent was going to a training class a few days after the seizure of a computer) with United States v. Laist, 702 F.3d 608, 616-17 (11th

Cir. 2012) (concluding that a 25-day delay was justified because "the government acted diligently").

### b. Qualified Immunity

The Phone Defendants argue they are also entitled to qualified immunity with respect to Bliss's Fourth Amendment claim because, even if the delay in securing a search warrant for Bliss's phone was unlawful, it was not in violation of a clearly established right.

As set out above, a defendant is entitled to qualified immunity unless he or she "(1) 'violated a federal statutory or constitutional right, and (2) the unlawfulness of his conduct was clearly established at the time.'" Hulbert, 70 F.4th at 732 (quoting Wesby, 583 U.S. at 62-63). Additionally, to obtain qualified immunity, a defendant "must show that even assuming the truth of all [the plaintiff's] factual allegations, qualified immunity is nonetheless clear on the face of [Plaintiffs' Amended] Complaint." Jennings, 240 F. Supp.2d at 507 (citing McVey, 157 F.3d at 276).

As discussed above, Bliss has adequately alleged a violation of her Fourth Amendment rights.

In determining whether Bliss has alleged that the unlawfulness of the extended seizure of her phone without a warrant was clearly established, the court must consider "not only 'specifically adjudicated rights,' but also 'those manifestly included within more general applications of the core constitutional

principles invoked.'" Booker v. S.C. Dep't of Corr., 855 F.3d 533, 538 (4th Cir. 2017) (quoting Wall v. Wade, 741 F.3d 491, 502-03 (4th Cir. 2014)).

Here, at the time Bliss's phone was seized, it was clearly established that an extended seizure could violate the Fourth Amendment. Pratt, 915 F.3d at 271. And, though courts have found similar delays to be reasonable, the undersigned is not persuaded that the issue of whether the delay here was reasonable can be determined in the context of a Motion to Dismiss.

Therefore, the undersigned will not recommend dismissal of this claim as to the Phone Defendants on the grounds of qualified immunity at this stage of the proceeding.

**2. Claim Against the City**

The only seizure-based claim brought against the City is Claim 4, which has been asserted pursuant to the North Carolina Constitution. And with respect to that claim, the only argument Defendants make for dismissal is that Plaintiffs have failed to allege a constitutional violation adequately because the extended seizure of Bliss's phone was reasonable. As discussed above, though, the undersigned finds that Plaintiffs' allegations are sufficient.

**C. PPA Claims**

The PPA provides that:

> it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize

> any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce . . . .
>
> 42 U.S.C. § 2000aa(a).

The PPA also includes, though, a "suspect exception" that allows a government officer or employee to search or seize work product materials "if there is probable cause to believe that the person possessing such materials has committed or is committing *the criminal offense to which the materials relate*." 42 U.S.C. § 2000aa(a)(1) (emphasis added).

Bliss and Blade bring two claims pursuant to the PPA. The first (Claim 5) is based on the seizure of Bliss's phone. The second (Claim 6) is premised on the City's alleged failure to train its officers, which, according to Bliss and Blade, led to the improper seizure of Bliss's phone.[6]

**1. The Suspect Exception**

The City relies on the Fourth Circuit's opinion in Sennett v. United States, 667 F.3d 531 (4th Cir. 2012), to support the proposition that where probable cause exists to arrest a person, the suspect exception bars a claim under the PPA by that person.

---

[6] To the extent the Amended Complaint indicates that this claim is premised on a failure to provide Bliss with an opportunity to oppose the issuance of the warrant, Plaintiffs "agree [that]…the PPA did not require that Bliss be given an opportunity to contest the warrant." Doc. 17 at 21, n. 11.

In Sennett, officers investigating property damage caused during a protest obtained evidence that suggested the plaintiff was involved in the incident and secured a search warrant for her electronic devices. See Sennett, 667 F.3d at 536-37. Because the facts "permitted [the investigating officer] to reasonably conclude [the plaintiff] was involved in the acts of vandalism" being investigated, the Fourth Circuit concluded that the PPA's suspect exception applied. Id. at 537.

Here, the Amended Complaint alleges that on January 19, 2022, Detective Cooper applied for and received a search warrant for Bliss's phone and that the affidavit supporting the application stated:

> [A] conspiracy was uncovered involving at least 19 suspects. Through executing a search warrant on one of the suspect's phones it was found that these suspects had communicated extensively about the protest on 12/21/21. Throughout the communication, members planned various aspects of the protest, ranging from its date to how they would deter the police from arresting them. They decided collectively to bill the protest as an 'art party' with the intention to 'wield that nonthreatening artist spin' and use 'heavy positive propaganda' to create an 'impediment' that would prohibit police intervention, especially because 'the optics of evicting camps around Christmas might be too much for the city.'
>
> Doc. 14 at ¶ 93; see also id. at ¶ 99.

Additionally, the Amended Complaint alleges that the warrant application stated:

> Through a review of Bliss's social media, she has extensive links to anarchist extremist groups including Asheville Social Justice Schedules which she lists herself as an 'author' for that page. On 12/21/21 Bliss lists, a 'community art build' on Tuesday 12/21/21 with an Instagram link which has since been removed. This community art build was identified as the protest where nearly 2000 lbs of litter were left and Bliss had prior knowledge of that protest.
>
> Id. at ¶ 94.

Reading the above allegations in the light most favorable to Bliss, it appears that Bliss's phone was seized at the time she was arrested for trespassing but that it was held, and later searched, in relation to an investigation of a separate offense of littering. Yet, it is not clear from the current record when the APD began investigating Bliss for the littering offense.

Accordingly, at the pleading stage, the undersigned is not persuaded that the suspect exception bars this claim. See Garcia v. Montgomery Cnty., Md., No. JFM-12-3592, 2013 WL 4539394, at *7 (D. Md. Aug. 23, 2013) (concluding that the plaintiff's PPA claim survived because there was "no suggestion by Montgomery County that [the plaintiff] was committing the criminal offense to which the materials relate" and further stating that "[i]n any event, the applicability of the suspect exception cannot be resolved on a motion to dismiss.") (emphasis added).

### 2. Failure to Train Causing PPA Violation

The PPA provides that a civil claim may be asserted "against the United States, against a State which has waived its sovereign immunity, . . . or against any other governmental unit, all of which shall be liable for violations of this chapter by their officers or employees while acting within the scope or under color of their office or employment." 42 U.S.C. § 2000aa-6(a)(1). The City argues that, pursuant to this language, a PPA claim may only be asserted against the City and that, in any event, the PPA is "phrased nearly in terms of strict liability" such that "deficient training would have no relevance to Plaintiffs' PPA claim, much less give rise to a distinct claim under that Act." Doc. 15-1 at 24.

Plaintiffs cite one case in which a court allowed a PPA claim to proceed based on "supervisory failures" similar to those giving rise to a failure to train claim in the context 42 U.S.C. § 1983. See Morse v. Regents of Univ. of California, Berkeley, 821 F. Supp.2d 1112, 1121 (N.D. Cal. 2011).

Other courts, however, have appeared to limit the reach of the PPA to preclude liability for "predicate acts by other officials." See e.g., Mink v. Suthers, 482 F.3d 1244, 1258 (10th Cir. 2007).

The undersigned finds the City's position on this issue to be more persuasive. The PPA allows a direct cause of action against a municipality for damages resulting from a violation of the Act. See 42 U.S.C. § 2000aa-6(a)(1).

Such an action arises from an alleged violation of the Act, regardless of whether the violation stemmed from a failure to train or an intentional act of an individual officer. Allowing a second PPA claim based on an alleged failure to train here would be duplicative. See Garcia, 2013 WL 4539394, at *7 ("Section 2000aa–6(a)(1) plainly holds governmental entities liable for acts of their officers and employees under color of office, and Mr. Garcia has adequately pled a violation of the PPA by MCPD officers.").

**V. Recommendation**

Based on the foregoing, the undersigned **RESPECTFULLY RECOMMENDS** that Defendants' Motion to Dismiss (Doc. 15) be **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. That the following claims be **DISMISSED**:
    a. Claim 1 (42 U.S.C. § 1983 claim based on alleged First Amendment violations) against the City;
    b. Claim 3 (Article I, Section 14 of the North Carolina Constitution); and,
    c. Claim 6 (Failure to Train Leading to Violations of the Privacy Protection Act).
2. That the following claims be allowed to proceed:
    a. Claim 1 (42 U.S.C. § 1983 claim based on alleged First Amendment violations) against the Individual Defendants;

b. Claim 2 (42 U.S.C. § 1983 claim based on alleged Fourth Amendment violations);

c. Claim 4 (Article I, Section 20 of the North Carolina Constitution); and,

d. Claim 5 (Privacy Protection Act).

Signed: August 28, 2026

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within fourteen (14) days of service of same. Responses to the objections must be filed within fourteen (14) days of service of the objections. Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).